## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRENDA K. REILING, as legal guardian, for and on behalf of B.J.W.R. and M.M.R., minors,<br><br>Plaintiff,<br><br>v.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 6:13-CV-01349-JAR

## MEMORANDUM AND ORDER

Plaintiff Brenda Reiling brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), seeking judicial review of Defendant Sun Life Assurance Company's denial of her claim for accidental death benefits. This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 35 and 37). For the reasons stated in detail below, the Court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment.

### I.      Background

The late Jennifer Reiling ("Ms. Reiling") was a participant in an employee benefit plan sponsored by her employer, Sonic Restaurants, Inc. ("Sonic"). The plan, which is subject to the provisions of ERISA, provides employees with life and accidental death benefits through a group insurance policy (the "Policy") issued by Defendant. The Policy requires Defendant to pay accidental death benefits upon proof that an insured employee died from an accidental bodily

injury.  The Policy excludes coverage, however, "for a loss which is due to or results from: . . . committing or attempting to commit an assault, felony or other criminal act."[1]  Sonic has delegated to Defendant its entire discretionary authority to construe the Policy's terms and to determine eligibility for benefits claimed under the Policy.

Ms. Reiling died in a car accident on July 1, 2012.  The Kansas Motor Vehicle Accident Report states that Ms. Reiling was driving east on U.S. Highway 54 when a westbound vehicle crossed the center line and collided with Ms. Reiling's car.  The driver of the westbound vehicle survived, but Ms. Reiling passed away at the crash site.  The investigating officer determined that, at the time of the accident, Ms. Reiling was driving with a suspended license—a class B misdemeanor under Kansas law.[2]

Plaintiff, Ms. Reiling's mother, submitted a claim for accidental death benefits on behalf of Ms. Reiling's two minor children.  Ms. Reiling had elected to pay for accidental death coverage totaling $75,000 and seat belt and air bag coverage totaling $26,250.  In a letter dated November 16, 2012, Defendant notified Plaintiff that those benefits were not payable: because Ms. Reiling was driving with a suspended license at the time of the accident, Defendant determined that "the injuries resulting in Jennifer's death falls [sic] within the Policy exclusion applicable to 'committing or attempting to commit an assault, felony or other criminal act.' "[3]

Plaintiff appealed.  On March 14, 2013, Defendant issued a written decision upholding its

---

[1]Doc. 38-3 at 149.

[2]*See* K.S.A. § 8-262(a)(1).  It is unclear whether Ms. Reiling knew her license had been suspended, as the notification letter had been sent to the home of Plaintiff, Ms. Reiling's mother.  Though Ms. Reiling had previously lived with Plaintiff, she had moved to a different address by the time the letter was sent.

[3]Doc. 38-6 at 326.

denial of accidental death benefits.  Defendant had confirmed with the officer in charge of

investigating Ms. Reiling's accident that driving with a suspended license was a criminal act

under Kansas law, and Defendant therefore affirmed its finding that Ms. Reiling's loss was "due

to or result[ed] from" her criminal act.  Defendant informed Plaintiff that she had exhausted all

administrative remedies available under the Policy.  Plaintiff now seeks review in this Court,

claiming Defendant's denial of accidental death benefits was arbitrary and capricious.

## II.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[4]

"Where, as here, the parties file cross-motions for summary judgment, [the Court is] entitled to

assume that no evidence needs to be considered other than that filed by the parties, but summary

judgment is nevertheless inappropriate if disputes remain as to material facts."[5]  The Court

considers cross-motions separately: the denial of one does not require the grant of the other.[6]

"To the extent the cross-motions overlap, however, the Court may address the legal arguments

together."[7]  The material facts are undisputed in this case, and the legal issues asserted with

respect to both motions are identical.  The Court will therefore address those issues together.

## III.     Discussion

---

[4]Fed. R. Civ. P. 56(a).

[5]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[6]*Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[7]*Berges v. Std. Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

Plaintiff contends that Defendant's interpretation of the Policy's criminal-act exclusion was arbitrary and capricious for two reasons: (1) an ordinary plan participant would view driving while suspended as a traffic violation, not a criminal act; and (2) the causal link between Ms. Reiling's death and her driving while suspended is too attenuated to satisfy the causal nexus required under the terms of the criminal-act exclusion.  The Court will address each contention in turn.  But first the Court must determine the appropriate standard for reviewing Defendant's decision to deny benefits.[8]

### A.    *Standard of Review*

In interpreting ERISA plans, courts must give plan language "its common and ordinary meaning as a reasonable person in the position of a [plan] participant . . . would have understood the words to mean."[9]  ERISA plan administrators may retain discretionary authority to construe the terms of the plan.[10]  Where, as here, the plan administrator has retained this authority "in explicit terms, [courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[11]  Under the arbitrary and capricious standard, the Court must uphold Defendant's determination so long as it is reasonable.[12]  "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and

---

[8]*See Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1002 (10th Cir. 2004).

[9]*Id.* at 1008.

[10]*Id.* at 1002–03 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[11]*See Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (quoting *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007)) (internal quotation marks and citations omitted).

[12]*See id.*

conflict of interest by the fiduciary."[13]

The parties do not dispute that the Policy gives Defendant discretionary authority to determine eligibility for benefits and to construe the terms of the Policy.  Nor do they dispute that Defendant, which functions as both administrator and insurer, operates under a conflict of interest because it is in a position to favor its own financial interests over the interests of Ms. Reiling's beneficiaries.[14]  The Court will therefore weigh the conflict of interest as a factor in determining whether Defendant's decision was arbitrary and capricious.[15]  Though the Court does not "dial back [its] deference,"[16] a conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[17]

Here, there is no indication that Defendant has taken steps to reduce potential bias.  The record shows that Defendant's claims analysts made the decision to deny benefits, and Defendant points to no evidence suggesting that it walls off its analysts from those interested in firm finances, penalizes inaccurate decisionmaking, or took any particular measure in this case to

---

[13]*Caldwell v. Life Ins. Co. of N.A.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citing *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992)).

[14]*See Fought*, 379 F.3d at 1003; *see also Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 n.4 (10th Cir. 2000) (explaining that an inherent conflict of interest exists when an insurer is also the administrator of a plan).

[15]*See Fought*, 379 F.3d at 1003 (quoting *Firestone*, 489 U.S. at 115).

[16]*See Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1157 n.1 (10th Cir. 2010) (quoting *Weber*, 541 F.3d at 1010–11).

[17]*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

5

promote independent and accurate claims assessment.[18]  Thus, in light of Defendant's financial interest in denying benefits in this case, the Court cannot completely discount the possibility that Defendant's conflict of interest affected its interpretation of the criminal-act exclusion.  The conflict of interest is entitled to some weight.

### B.        Driving While Suspended as a "Criminal Act"

The Policy excludes coverage for accidental death benefits "for a loss which is due to or results from: . . . committing or attempting to commit an assault, felony or *other criminal act*."[19]  Plaintiff contends this exclusion does not bar her claim for benefits because an ordinary plan participant would view driving while suspended as a traffic violation, not a "criminal act." Though some traffic violations, including driving while suspended, are technically misdemeanors under Kansas law, it is not clear that misdemeanor offenses are "criminal acts" under the terms of the Policy.  The Policy's language, moreover, must be considered "not in a technical but in a popular sense."[20]  In that vein, Plaintiff urges that most people would not consider a misdemeanor traffic violation similar enough to an assault or felony to fall under the same criminal-act exclusion.

Courts reviewing benefits determinations *de novo* have interpreted similar policy exclusions to be ambiguous.[21]  A "crime," broadly construed, might include certain traffic

---

[18]*See id.*

[19]Doc. 38-3 at 149 (emphasis added).

[20]*See Webb v. Allstate Life Ins. Co.*, 536 F.2d 336, 339 (10th Cir. 1976).

[21]*See, e.g.*, *Bekos v. Providence Health Plan*, 334 F. Supp. 2d 1248, 1251, 1257-58 (D. Or. 2004) (finding a policy exclusion applying to "the commission or attempted commission of an assault or other illegal act" to be ambiguous); *Bates v. Crown Life Ins. Co.*, No. C-2-83-2154, 1987 WL 862369, at *9 (S.D. Ohio Mar. 31, 1987) (finding a policy exclusion applying to the "commission of . . . an assault or any criminal offense").

infractions; but construed narrowly, a "crime" might refer only to violent acts directed against third parties.[22]  The narrower construction, in fact, may be more appropriate where a policy exclusion first enumerates specific types of violent or serious crimes before referring generally to "other criminal acts."[23]  Thus, construing ambiguity strictly against policy drafters, those courts have found illegal-act exclusions inapplicable to traffic violations.[24]  Here, however, the Court does not engage in *de novo* review, but instead considers only whether Defendant's benefits determination was arbitrary and capricious.  The doctrine of *contra proferentem*, requiring ambiguities to be resolved against the contract's drafter, is therefore inapplicable.[25]  And even where policy terms are ambiguous, the plan administrator's interpretation must be upheld so long as it is reasonable.[26]

Viewing the exclusion provision as a whole, the Court finds the term "criminal act" ambiguous.  A plan participant could reasonably believe the exclusion does not apply to traffic infractions, which are not commonly thought of as crimes and which, in any event, are less serious than those crimes the Policy specifically excludes.  But another plan participant might reasonably conclude that a "criminal act" is any act that lawmakers in the relevant jurisdiction have deemed a crime.  Because both interpretations are reasonable, the Court must uphold

---

[22]*See Bekos*, 334 F. Supp. 2d at 1253.

[23]*See Bates,* 1987 WL 862369 at *5–6 (applying the doctrine of *ejusdem generis* to conclude that the general term "other criminal offense" included only violent offenses, since only violent offenses were specifically enumerated).

[24]*See, e.g.*, *Bekos*, 334 F. Supp. 2d at 1257–58 (concluding that driving under the influence was not an "illegal act" under the terms of the policy exclusion); *Bates*, 1987 WL 862369, at *5–6 (finding that driving under the influence was not a "criminal offense" under the terms of the policy exclusion).

[25]*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999).

[26]*See id.* at 1098.

Defendant's interpretation.[27]  Defendant correctly determined that K.S.A. § 8-262(a)(1) classifies driving while suspended as a class B misdemeanor, punishable by at least five days' imprisonment and a fine of at least $100.[28]  The Kansas Criminal Code sets sentencing parameters for class B misdemeanors.[29]  And Kansas courts have consistently and repeatedly referred to driving while suspended as a "crime" under state law.[30]  Because the state of Kansas evidently views driving while suspended as a crime, it was not unreasonable for Defendant to interpret the Policy accordingly.  The Court will not set aside the benefits determination on this basis.

### C.      Causal Nexus

Having determined that Defendant's interpretation of "criminal act" is reasonable, the Court must now consider whether the Policy's causal nexus requirement is met.  The criminal-act exclusion applies only if Ms. Reiling's death was "due to or result[ed] from" her criminal act.  Plaintiff insists the required causal nexus is absent in this case.  The accident report shows that Ms. Reiling was free of fault in the crash that caused her death.  The status of Ms. Reiling's driver's license, moreover, did not increase the risk that she would die in an accident.  Plaintiff therefore contends that Ms. Reiling's traffic infraction did not proximately cause her death and

---

[27]*See id.* at 1100 ("When a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative.").

[28]K.S.A. § 8-262(a)(1) ("Any person who drives a motor vehicle on any highway of this state at a time when such person's privilege to do so is canceled, suspended or revoked . . . shall be guilty of a class B nonperson misdemeanor on the first conviction.").

[29]*See* K.S.A. § 21-6602.

[30]*See, e.g.*, *Kansas v. Perkins*, 290 P.3d 636, 638 (Kan. 2012) ("The State charged Perkins with three crimes: . . . and driving while suspended (DWS) in violation of K.S.A. 2008 Supp. 8-262."); *Kansas v. Suter*, 290 P.3d 620, 628 (Kan. 2012) ("the *actus reus* of the crime of DWS is driving without a privilege to do so.").

did not contribute to her death to any legally significant degree.  Defendant responds that Ms.

Reiling's driving while suspended, even if not the sole cause of her death, was still *a* cause:

"[s]imply put, her death would not have occurred if she had obeyed the law and not driven with a

suspended license."[31]

    As Plaintiff points out, Defendant relies on classic but-for causation to link Ms. Reiling's

death with her act of driving while suspended.  Defendant's causal argument goes something like

this: but for her criminal act of driving while suspended, Ms. Reiling might not have been on the

highway when the westbound vehicle crossed the center line; but for her position on the highway

when the westbound vehicle crossed the center line, the westbound vehicle would not have

collided with Ms. Reiling's car; but for the collision, Ms. Reiling would not have suffered

injuries; and but for her injuries, Ms. Reiling would not have died.  As this chain of causation

shows, Ms. Reiling's traffic offense did not directly or proximately cause her death; another

individual's improper driving did that.  Nor did Ms. Reiling's traffic offense place her at an

inordinate risk of harm: driving while suspended is no riskier than driving in a perfectly legal

manner.  The record, in fact, shows that the traffic offense did not contribute to Ms. Reiling's

death in any way except to place her, by random chance, in the wrong location at the wrong time.

The traffic offense, in other words, merely "afford[ed] the occasion of the injury."[32]  The issue

on review thus becomes whether Defendant was reasonable to rely on this but-for theory of

causation to conclude that Ms. Reiling's death was "due to or result[ed] from" her criminal act.

---

[31]Doc. 38 at 12.

[32]*See* COUCH ON INSURANCE § 140:28 (noting that an illegal-act exclusion generally will not apply when the illegal act simply "affords the occasion of the injury," as "there must be at least a slight causative connection between the violation and the ensuing loss").

1.      Relevant Case Law

The Tenth Circuit, on both *de novo* and deferential review, has foreclosed the use of but-for causation to link otherwise insurable harms with ERISA-plan exclusion triggers.  *Kellogg v. Metropolitan Life Insurance Co.*[33] involved an insured who suffered a seizure while driving, causing him to veer off the road and into a tree.  He died from injuries sustained in the accident. Mr. Kellogg's insurer, however, refused to pay accidental death benefits under a policy provision excluding coverage for "any loss caused or contributed to by: . . . physical or mental illness or infirmity."[34]  The Tenth Circuit, on *de novo* review, accepted the insurer's assertion that a seizure is a physical infirmity.  But the court rejected the argument that the seizure "caused or contributed to" Mr. Kellogg's death: though Mr. Kellogg would not have been in the fatal accident had he not suffered a seizure, "courts have long rejected attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness."[35]  A reasonable policyholder, the court continued, would view the seizure as a cause that contributed only to Mr. Kellogg's car accident, not to his death.[36]  Thus, though the seizure was a but-for cause of the Mr. Kellogg's death, the court found the seizure did not "cause" or "contribute to" his death under the terms of the plan.  A more direct causal relationship was necessary to trigger the policy exclusion.[37]

The Tenth Circuit addressed a similar but-for causation argument in *Fought v. UNUM*

---

[33]549 F.3d 818 (10th Cir. 2008).

[34]*Id.* at 819–20, 822.

[35]*See id.* at 831.

[36]*Id.* at 832.

[37]*See id.* at 832–33.

10

*Life Insurance Co.*[38]   Importantly, as in this case, the insurer in *Fought* retained discretionary

authority to construe the terms of the plan; the court thus reviewed the insurer's benefits

determination under the arbitrary and capricious standard.[39]   The policy at issue in *Fought*

excluded coverage for disabilities "caused by, contributed to by, or resulting from" a pre-existing

condition.[40]   Ms. Fought had a pre-existing coronary artery disease which required surgery.   That

surgery left a surgical wound that later split open and became infected, resulting in Ms. Fought's

long-term hospitalization.   Ms. Fought's insurer denied her subsequent claim for disability

benefits: the disability, according to the insurer, was "contributed to by" or "resulted from" Ms.

Fought's pre-existing coronary artery disease.[41]   The Tenth Circuit set aside that benefits

determination.   Recognizing the primary issue as "a matter of where [to] draw the line on chains

of causation," the court rejected the insurer's contention that a mere but-for cause could satisfy

the policy exclusion's causal nexus requirement.[42]   To accept the insurer's causation argument,

the court found, "would effectively render meaningless the notion of the pre-existing condition

---

[38]379 F.3d 997 (10th Cir. 2004).

[39]*Id.* at 1003.   The insurer in *Fought* functioned as both insurer and plan administrator.   Because of the conflict of interest, and in accordance with previous circuit practice, the *Fought* court shifted the burden to the administrator to establish that the denial of benefits was not arbitrary and capricious.   *See id.* at 1005.   The Supreme Court rejected that burden-shifting approach in *Glenn*, 544 U.S. at 115–117 (2008), holding that courts should simply weigh conflicts of interest as factors in making arbitrary-and-capricious determinations.   Aside from *Fought*'s shifting of the burden, however, the decision's arbitrary-and-capricious analysis apparently remains good law.   *See Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1158 n.1 (10th Cir. 2010) (noting that the Tenth Circuit has interpreted its pre-*Glenn* approach as consistent with *Glenn*—despite language in *Fought* and other cases suggesting that courts should reduce their deference in conflict of interest cases—because the circuit has always applied an arbitrary and capricious standard); *see also LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 801 (10th Cir. 2010) (citing *Fought*'s causation analysis to support a finding that driving under the influence did not cause an insured's injuries).

[40]*Fought*, 379 F.3d at 999.

[41]*Id.* at 999–1001.

[42]*Id.* at 1009–10 (rejecting UNUM's contention that "it need not cover anything for which it can construct a but/for story").

by distending the breadth of the exclusion."[43]  Thus, though Ms. Fought's disability would not have occurred had she not suffered from the pre-existing coronary artery disease, the disease did not "contribute to" or "result in" the disability.  The insurer's reliance on the remote causal connection between the disability and the pre-existing condition, moreover, was arbitrary and capricious.[44]

Similar to the policies in *Kellogg* and *Fought*, the Policy at issue here excludes coverage for losses "due to" or "result[ing] from" certain exclusion triggers.  And like the insurers in those two decisions, Defendant attempts to create a causal nexus by relying on a but-for relationship between an exclusion trigger and the insured's loss.  Despite the holdings in those decisions, however, Defendant does not address *Kellogg* or *Fought*.  Instead, Defendant refers the Court to cases indicating that an insured's loss may be "due to" multiple causes.[45]  While that proposition is certainly true, it does not support Defendant's reliance on a remote, but-for relationship to satisfy the Policy's causal nexus requirement here.  Every case Defendant cites involved at least a significant causal relationship between the insured's loss and an exclusion-triggering condition or event.

Defendant first cites the Tenth Circuit's decision in *Kimber v. Thiokol Corp.*[46]  There, the policy capped coverage at two years for disabilities which were "due to a mental condition."  Mr. Kimber suffered from diabetes as well as several mental conditions, including depression, mild

---

[43]*Id.*

[44]*See id.*

[45]*See Jimenez v. Sun Life Assurance Co. of Can.*, 486 F. App'x 398, 411 (5th Cir. 2012); *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145–47 (2d Cir. 2003); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999).

[46]196 F.3d 1092 (10th Cir. 1999).

dementia, and anxiety disorder.  The plan administrator found that this combination of physical and mental conditions resulted in Mr. Kimber's total disability, but concluded that the disability-coverage cap applied because his disability was "due, at least in significant part, to a mental condition."[47]  The court found that interpretation of "due to" reasonable because it required a "*significant relationship* between the [mental] condition and the disability."[48]

The Fifth Circuit also addressed the issue of multiple causes in *Jimenez v. Sun Life Assurance Co. of Canada*.[49]  Mr. Jimenez had claimed disability benefits after he crashed his vehicle while driving under the influence of alcohol.  The policy excluded coverage for disabilities "due to" illegal acts.  Though his blood-alcohol concentration was twice the legal limit, however, Mr. Jimenez argued that his driving under the influence did not cause the accident.  The reason he had swerved off the road, he contended, was to avoid two racing cars that were approaching him on the highway.[50]  The court, noting the lack of evidence to support this assertion, accepted Mr. Jimenez's story for the sake of argument.[51]  But even under the assumed facts, substantial evidence supported the finding that the accident was "due to" both the racing cars and the DUI.[52]  Mr. Jimenez's driving under the influence, however, did more than merely afford the occasion of the injury: the court found that at Mr. Jimenez's level of intoxication, he would "suffer from impaired reflexes, reaction time, and gross motor control."[53]

---

[47]*Id.* at 1095–97.

[48]*See id.* at 1100 (emphasis added) (internal quotation marks omitted).

[49]486 F. App'x 398 (5th Cir. 2012).

[50]*Id.* at 401–02.

[51]*Id.* at 411.

[52]*Id.* at 411–12.

[53]*See id.*

Mr. Jimenez's driving under the influence, therefore, positively contributed to his injury by impairing his ability to react to and safely avoid the racing cars.[54]  Thus, unlike Ms. Reiling's driving while suspended, Mr. Jimenez's illegal act was more than a remote, but-for cause of his loss.

Defendant next cites *Celardo v. GNY Automobile Dealers Health & Welfare Trust*,[55] where the Second Circuit considered whether the injuries Mr. Celardo sustained in a car accident "result[ed] from . . . participation in or in consequence of having participated in an illegal act."[56]  Mr. Celardo suffered injuries after losing control of his car in an attempt to pass another vehicle in a no-passing zone.  He was cited for several traffic infractions, including driving a vehicle with bald tires; crossing a solid, double-yellow line; driving an uninsured, uninspected vehicle; and using improper dealer license plates.[57]  Applying the arbitrary and capricious standard, the court rejected Mr. Celardo's argument that an insufficient causal link existed between his traffic violations and his injuries.[58]  Though Mr. Celardo "ha[d] a decent argument that his placing the dealer plates on the unregistered, uninsured, and uninspected Corvette did not directly cause his injuries," the court found that his other traffic violations—crossing a solid, double-yellow line on bald tires—did cause the injuries.[59]  The court then commented on the defendant's proposed causal nexus between Mr. Celardo's injuries and his driving with illegal dealer plates:

> The Trust supports its causation analysis by arguing that had Celardo

---

[54]*See id.*

[55]318 F.3d 142 (2d Cir. 2003).

[56]*Id.* at 144.

[57]*Id.* at 144–45.

[58]*See id.* at 147.

[59]*See id.*

not illegally placed the dealer plates on the Corvette, he would not have been able to drive the Corvette on that fateful day. Again, while this causal link is not overwhelming, the Trustees' reading of the policy language excluding injuries "resulting from . . . participation in . . . an illegal act" as barring recovery for Celardo's injuries is a reasonable interpretation of the Plan. That is sufficient for us.[60]

The Court finds *Celardo* questionable authority for Defendant's interpretation of the Policy at issue in this case. First, *Celardo*'s observation on the causal link between Mr. Celardo's injuries and the dealer plates was not necessary to the decision's holding: the court had already found substantial evidence of traffic violations with a significant causal relationship to the injuries.[61] Second, since *Celardo*, at least one circuit has expressly disapproved of the *Celardo* Trustees' causation argument.[62] Though *Majestic* was decided on *de novo* review, its rejection of the but-for approach and its factual similarity to this case diminish the reasonableness of Defendant's continued reliance on the plan interpretation proffered earlier in *Celardo*. Finally, and most importantly, *Celardo*'s acceptance of the but-for argument conflicts with the Tenth Circuit's later decisions in *Kellogg* and *Fought*, the latter of which was decided under the arbitrary and capricious standard. Because those decisions are binding precedents in this circuit, Defendant's interpretation of the Policy appears contrary to controlling case law. A legally erroneous plan interpretation is indicative of arbitrariness and capriciousness.[63]

---

[60]*Id.*

[61]*See id.*

[62]*See Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 371–72 (6th Cir. 2009) (finding that an insured's car accident, in which he was free of fault, did not "result[] from" his driving with a suspended license).

[63]*See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) ("Indicia of arbitrary and capricious decisions include lack of substantial evidence, *mistake of law*, bad faith, and conflict of interest." (emphasis added)); *Woolsey v. Marion Labs.*, 934 F.2d 1452, 1456–57 (10th Cir. 1991) ("The decisions of administrators of a pension plan will be upheld unless they are arbitrary and capricious, not supported by substantial evidence or *erroneous on a question of law*.") (emphasis added).

2.      Construction With Other Policy Provisions

Defendant urges the Court to read the criminal-act exclusion in conjunction with the Policy's definition of "accidental death," which states that a death is "accidental" only if sustained "directly and independently of all [non-accidental] causes."[64] This definition, Defendant contends, reinforces the reasonableness of its interpretation of the causal nexus requirement: the Policy required Defendant to deny benefits upon finding that *any* non-accidental cause, including a criminal act, contributed to Ms. Reiling's death.

Again, however, the Tenth Circuit has rejected similar arguments.  In *LaAsmar v. Phelps Dodge Corp.*,[65] for example, an insurer denied a claim for accidental death benefits on the basis that Mr. LaAsmar's death in a car crash was not "accidental."  The insurer reasoned that the crash was not the "sole cause" of Mr. LaAsmar's death, as his driving under the influence of alcohol caused the single-vehicle accident.[66]  The court, citing its prior decisions in *Kellogg* and *Fought*, rejected the insurer's argument.[67]  Though Mr. LaAsmar might not have died had he not been driving under the influence, under the reasoning of *Kellogg* and *Fought*, Mr. LaAsmar's driving under the influence was too remotely related to his injuries to be considered a "cause" under the terms of the plan.[68]  The court found that "[Mr.] LaAsmar died, not of alcohol intoxication, but as a result of head and internal injuries suffered in a motor vehicle crash.  The sole cause of the loss, [Mr.] LaAsmar's death, was the crash."[69]  If Mr. LaAsmar's driving under

---

[64]Doc. 38-3 at 133.

[65]605 F.3d 789 (10th Cir. 2010).

[66]*Id.* at 794–95, 801.

[67]*Id.* at 801–02.

[68]*See id.*

[69]*See id.* at 802.

the influence did not sufficiently "cause" his death in a single-vehicle accident, Ms. Reiling's driving while suspended also did not cause her death here. Under *LaAsmar*, *Kellogg*, and *Fought*, therefore, the Policy's definition of "accidental death" does not support Defendant's use of but-for causation to deny benefits in this case.

        3.        Construction in Light of Public Policy

Defendant also contends public policy supports its interpretation. According to Defendant, paying benefits in this case would be unlawful because Kansas public policy prohibits "awarding benefits for breaking the law." But this argument assumes an affirmative answer to the question at issue: whether a legally sufficient causal connection exists between Ms. Reiling's unlawful act and the loss for which her beneficiaries claim benefits. If no such causal connection exists, benefits would not be awarded "*for* breaking the law," but would be awarded simply for a loss suffered in a car accident in which the insured was free of fault.

To the extent Kansas public-policy cases shed light on whether a sufficient causal connection exists in this case, they support Plaintiff's position. Under Kansas law, indemnification against the consequences of an insured's criminal act is void as against public policy only if the harm sustained is the "natural and probable consequence" of the criminal act.[70] A fatal car accident is not the natural and probable consequence of driving with a suspended license: as already noted, driving while suspended, standing alone, is no more dangerous than driving in a wholly legal manner.[71] Defendant's interpreting the Policy to require only a but-for causal connection, therefore, appears only more unreasonable in light of Kansas public policy.

---

    [70]*See Guar. Nat'l Ins. Co. v. McGuire*, 173 F. Supp. 2d 1107, 1114 (D. Kan. 2001) (reviewing Kansas cases and concluding that the "natural and probable consequences" test applies to public policy criminality defenses).

    [71]*See id.* at 1114–15 (finding that a fatal car accident was not the natural and probable consequence of the insured's participation in stealing a pickup, where the insured followed the stolen pickup in his own vehicle and, two hours after the theft, lost control of the vehicle while driving on a gravel road at thirty-five miles per hour).

4.      Arbitrariness and Capriciousness

As Plaintiff persuasively argues, an ordinary plan participant would view Ms. Reiling's death as "due to" or "result[ing] from" a car crash caused solely by another driver crossing the center line—not Ms. Reiling's traffic offense of driving while suspended.  Yet Defendant maintains that its interpretation of the Policy's causal nexus requirement, even if not the best one possible, is reasonable.

The Court disagrees.  Defendant denied coverage in this case using a form of but-for causal reasoning that, if accepted, risks immeasurably expanding the breadth of the Policy's exclusions.  Allowing that result would be unreasonable.[72]  The Tenth Circuit, moreover, has expressly disapproved the use of but-for causation to exclude coverage under ERISA policies similar to this one.[73]  In light of established and controlling case law, Defendant's continued reliance on the but-for argument and its legally erroneous application of a but-for causal theory in this case must be deemed arbitrary and capricious.[74]  The Court finds that the Policy's language does not reasonably apply to the attenuated causal chain between Ms. Fought's driving while suspended and her death.

Because there is no genuine issue as to whether Defendant violated ERISA by failing to make a reasonable determination on Plaintiff's claim for benefits, the Court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment.

---

[72]*See id.* at 1010 ("If we were to accept this [but-for] contention, we would effectively render meaningless the notion of the pre-existing condition clause by distending the breadth of the exclusion.").

[73]*See Kellogg*, 549 F.3d at 832–33 (rejecting the but-for argument under a policy excluding coverage for losses "caused or contributed to" by physical illness); *Fought*, 379 F.3d  at 999, 1010 (rejecting the but-for argument under a policy excluding coverage for disabilities "caused by, contributed to by, or resulting from" pre-existing conditions).

[74]*See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) ("Indicia of arbitrary and capricious decisions include lack of substantial evidence, *mistake of law*, bad faith, and conflict of interest.")

18

### D.      Prejudgment Interest

In addition to the accidental-death, seat belt, and air bag benefits totaling $101,250, Plaintiff asks for prejudgment interest.  Since the Court has determined that Plaintiff is entitled to recover, the Court has authority to determine benefits due and to award them.  "Once the court has determined that the participant has been wrongfully denied benefits, the court enters judgment for the amount of the benefits due with prejudgment interest for the unpaid sums from the date that they were due under the terms of the plan."[75]

Prejudgment interest is designed to compensate a wronged party for the period during which the party was denied the full use and benefit of money.[76]  "The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party. Second, even if the award of prejudgment interest is compensatory in nature, the district court must still determine whether the equities would preclude the award of prejudgment interest."[77] The Tenth Circuit looks to state law in determining the prejudgment interest rate in ERISA cases.[78]  Currently, the prejudgment interest rate in Kansas is 10%.[79]

Here, because Plaintiff was not paid accidental death benefits due to her, the Court finds that prejudgment interest will serve to compensate Plaintiff for the time she was disallowed use of the benefits.  An award of prejudgment interest is an essential component of full compensation to Plaintiff, and the Court finds no reason equity would preclude that award in this

---

[75]*Kansas v. Titus*, 452 F. Supp. 2d 1136, 1152 (D. Kan. 2006) (quoting *Johnson v. Dayco Prods., Inc.*, 973 F. Supp. 1255, 1266 (D. Kan. 1997)).

[76]*Caldwell v. Life Ins. Co. of N.A.*, 287 F.3d 1276, 1287 (10th Cir. 2002).

[77]*Id.* at 1286 (quoting *Eastman Kodak Co. v. Westway Freight, Inc.*, 949 F.2d 317, 321 (10th Cir. 1991)) (internal quotation marks omitted).

[78]*Titus*, 452 F. Supp. 2d at 1152.

[79]K.S.A. § 16-201.

case.  Accordingly, the Court orders an award of prejudgment interest at the statutory rate of 10% running from July 23, 2012, the date Plaintiff filed its claim for benefits.

      **IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 35) is granted.

      **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 37) is denied.

      **IT IS FURTHER ORDERED** that Plaintiff shall receive prejudgment interest at the statutory rate of 10% running from July 23, 2012, to the date of judgment in this case.

Dated: <u>December 5, 2014</u>

                                    S/ Julie A. Robinson
                                   JULIE A. ROBINSON
                                   UNITED STATES DISTRICT JUDGE